1
2
3
4
5
6
7
8                      UNITED STATES DISTRICT COURT

9                     SOUTHERN DISTRICT OF CALIFORNIA

10

11   STEVEN SWARTWOOD;              Case No: 12-CV-1665 W  (BGS)
     JOANNA SWARTWOOD; R.S., a
12   minor; and D.S., a minor by and    ORDER: (1) GRANTING IN PART
     through their Guardian *Ad Litem*,  AND DENYING IN PART
13   Judy Swartwood,                 DEFENDANTS' MOTION FOR
14                                   PARTIAL SUMMARY JUDGMENT
                              Plaintiffs,  [DOC. 42]; (2) GRANTING IN
15          v.                       PART AND DENYING IN PART
                                     PLAINTIFFS' MOTION FOR
16                                   PARTIAL SUMMARY JUDGMENT
17                                   AGAINST THE INDIVIDUAL
     COUNTY OF SAN DIEGO; SAN        DEFENDANTS [DOC. 45]; AND
18   DIEGO HEALTH AND HUMAN          (3) GRANTING PLAINTIFFS'
     SERVICES AGENCY; POLINSKY       MOTION FOR PARTIAL
19   CHILDRENS CENTER; MAYA          SUMMARY JUDGMENT AGAINST
     BRYSON; WENDY CURIEL;           THE COUNTY DEFENDANTS
20   DELLY ROLLINS; and SUSAN        [DOC. 46]
21   SOLIS,

22                              Defendants.

23

24          Plaintiffs are Steven and Joanna Swartwood, their son D.S., and daughter R.S.

25   Defendants are the County of San Diego, the San Diego Health and Human Service

26   Agency, the Polinsky Children's Center (collectively, the "County"), and four

27   individuals employed by the Agency: Maya Bryson, Wendy Curiel, Kelly Rollins, and

28   Susan Solis (collectively, the "Individual Defendants").

                                    - 1 -                        12-CV-1665 W

1    Plaintiffs filed this lawsuit after D.S. and R.S. were removed from their home
2    without a warrant and subjected to medical exams, which included a urine test and
3    examination of their genitalia, without notice to Steven or Joanna.  Defendants admit
4    that the medical exams were performed pursuant to the County's policy that does not
5    provide notice to the parents and excludes them from the medical exams.  Plaintiffs
6    contend Defendants' conduct in removing the children, continuing to detain the
7    children, and conducting the medical exams violated their Fourth Amendment and
8    Fourteenth Amendment rights and are suing under 42 U.S.C. § 1983.  Plaintiffs also
9    allege a number of state-law causes of action.

10    Pending before the Court are the parties' cross motions for partial summary
11    judgment.  The parties have also filed a number of evidentiary motions, which are
12    addressed in a separate order.  (*See Evidentiary Order* [Doc. 73].)  The Court decides
13    the cross-motions on the papers submitted and without oral argument.  See Civ. L. R.
14    7.1(d.1).  For the reasons discussed below, the Court **GRANTS IN PART** and
15    **DENIES IN PART** Defendants' motion [Doc. 42], **GRANTS IN PART** and **DENIES**
16    **IN PART** Plaintiffs' motion against the Individual Defendants [Doc. 45], and
17    **GRANTS** Plaintiffs' motion against the County [Doc. 46].

18

19    **I.    BACKGROUND**[1]

20        **A.    R.S. sustains facial injuries while at day care.**

21    In approximately April 2011, Joanna enrolled D.S. and R.S. at Shelly's Home
22    Daycare.  At the time, D.S. was 3, and R.S. was 1.

23    On Monday, May 16, 2011, Joanna dropped the children off at daycare.  At
24    about 2:40 p.m., Joanna received a telephone call from the daycare owner, Shelley
25    McCoshum, who said that redness developed on R.S.'s face around 11:00 a.m. from

---

27    [1] Throughout this order, parties and witnesses will be referred to by their last name.  However,
28    to avoid any confusion, where multiple parties or witnesses share the same last name, they will be
      referred to by their first name.

1    either a fall on the trampoline or an allergic reaction.  (*Joanna Dec.* [Doc. 45-6], ¶ 6.[2])

2    Steven picked up the children from daycare.  When they arrived home, Joanna

3    saw redness and puffiness on R.S.'s face and called Kaiser's nurse line.  (*Joanna Dec.*, ¶

4    7.)  After discussing R.S.'s condition, the nurse advised Joanna to take R.S. to the first

5    available appointment, which was the following day at 4:30 p.m.  (*Id.*)

6    The next day, R.S. and D.S. did not go to daycare, but instead stayed with their

7    maternal grandparents.  (*Joanna Dec.*, ¶ 8.)  At the 4:30 p.m. appointment, Dr. Andrea

8    Siano examined R.S. and told Joanna that R.S.'s facial injuries appeared to be "inflicted

9    and non-accidental" in nature, and advised her to take R.S. and D.S. to Kaiser Zion

10   Hospital's emergency room for further testing.  (*Id.*, ¶ 9.[3])  Upon hearing that R.S.'s

11   injuries appeared non-accidental, Joanna became tearful and upset.  (*Defs' NOL* [Doc.

12   42-13], Ex. A (sealed) [Doc. 44] at p.1.)  Based on Joanna's reaction, Dr. Siano did not

13   suspect that R.S.'s injuries were caused by anyone in the family.  (*Id.*)

14   Joanna followed Dr. Siano's advice.  (*Joanna Dec.*, ¶ 10.)  After leaving the

15   doctor's office, Joanna drove home, picked up D.S. and Steven, and then the entire

16   family drove to Kaiser Zion Hospital's emergency room.  (*Id.*, ¶ 10.)  Dr. Paul B.

17   Dohrenwend was the attending physician.  He spent approximately an hour and 45

18   minutes with the Swartwoods, during which time he examined R.S. and concurred that

19   her facial injuries appeared non-accidental.  (*Id.*, ¶ 11; *Owens Dec.* [Doc. 42-6], ¶ 8.)

20   Dr. Dohrenwend and the Swartwoods also discussed whether R.S. should undergo

21   further testing.  (*Joanna Dec.*, ¶ 11.)  There was extensive discussion regarding the risks

22   of radiation and the possibility R.S. could develop tumors in the future.  (*Id.*, ¶ 17;

23   _____

24   [2] Plaintiffs filed duplicate copies of certain documents (e.g., Steven and Joanna's declarations, their Request for Judicial Notice, etc...), one in support of the motion against the Individual

25   Defendants and the other in support of the motion against the County.

26   [3] Joanna's declaration states that Dr. Siano advised her to take "R.S. and R.S. to" the

27   hospital.  (*J. Swartwood Dec.*, ¶ 9.)  The Court assumes she meant "R.S. and D.S." based on Joanna's statement in the next paragraph that "[i]n accordance with Dr. Siano's advice, I went

28   home and picked up D.S. . . and took both R.S. and D.S. to Kaiser Zion ER.  (*Id.*, ¶ 10.)

*Steven Dec.* [Doc. 45-7], ¶ 11.)   Dr. Dohrenwend consulted with three Kaiser pediatricians who opined that additional testing that evening was not necessary because R.S. "was not presenting with neurological problems or vomiting." (*Defs' NOL*, Ex. A (sealed) at p.1; *Owens Dec.*, ¶ 8; *Joanna Dec.*, ¶ 11.)   And after Dr. Dohrenwend indicated that he would not have his own children subjected to the additional testing, Steven and Joanna decided to decline having the testing done that evening.   (*Joanna Dec.*, ¶ 17; *Steven Dec.*, ¶ 11.)  However, the Swartwoods planned to consult with R.S.'s regular pediatrician, Dr. Rachel Ireland, the next day.   (*Steven Dec.*, ¶ 11; *Pls Sealed Exhibits* [Doc. 48], Ex. 7 at p. 3.)

## B.   R.S.'s injuries are reported to Child Protective Services.

Meanwhile, Dr. Siano contacted the Agency's child abuse hotline and made a mandated report of R.S.'s injuries.  Dr. Siano talked to the Agency's hotline screener, Patience Owens, and reported that Joanna had brought in her one-year-old daughter due to concerns about a rash on her face.  (*Owens Dec.*, ¶ 3; *Defs' NOL*, Ex. A (sealed) at p. 1.)  Dr. Siano told Owens that Joanna was contacted the day before by the daycare and told R.S. developed a rash, but Dr. Siano believed R.S.'s facial injuries were "inflicted and non-accidental." (*Id.*)  Dr. Siano reported that Joanna also stated that the Swartwood's son, D.S., who also attends the daycare, "has been crying and hesitant to attend the daycare for the past two weeks." (*Owens Dec.*, ¶ 3.)  Dr. Siano stated that she referred Joanna to Kaiser's emergency room for further testing, informed Owens that Joanna appeared tearful and upset upon hearing that the injuries appeared non-accidental, and stated that she "did not have any suspicions that the abuse came from the family . . . based on what Joanna reported." (*Id.*; *Defs' NOL*, Ex. A (sealed) at p.1.)

Later, Owens contacted the emergency room to confirm Joanna had taken the children.  (*Owens Dec.*, ¶ 4.)  Emergency room nurse Michelle Fowler confirmed the Swartwoods were there, and that Dr. Dohrenwend had examined R.S.  (*Id.*, ¶ 6.)  Dr.

1   Dohrenwend then got on the phone and told Owens that "the parents elected not have
2   R.S. undergo the CT scan, skeletal exam, or X-rays because of the amount of radiation
3   involved, and because R.S. did not present with neurological problems or vomiting.  He
4   said they had consulted with three different pediatricians at Kaiser and feel the extra
5   testing is not needed."  (*Id.*, ¶ 8; *see also Defs' NOL*, Ex. B (sealed) [Doc. 44] at p. 1.)
6   Dr. Dohrenwend also told Owens that the parents "expressed that they would not send
7   the minors back to the daycare given the suspicion that the marks are being considered
8   to be inflicted injuries."  (*Defs' NOL*, Ex. B (sealed) at p. 1.)

9       Owens then talked to Nurse Fowler again, who stated that the "marks [on R.S.'s
10  face] could be from coughing or other activity such as vomiting."  (*Owens Dec.*, ¶ 9.)
11  Joanna was then put on the phone and asked Owens "if she should send the children
12  back to the daycare tomorrow.  She also asked if she should contact the daycare
13  provider to inform them about the children not attending tomorrow.  [Owens] told her
14  a social worker from the Agency would be contacting them shortly to answer their
15  questions."  (*Id.*, ¶ 10; *Defs' NOL*, Ex. B (sealed) at p. 1.)

16

17  **C.**   **Defendant Wendy Curiel decides to send Defendant Maya Bryson to**
18       **the Swartwoods' home.**

19       On May 17, 2011, Defendant Wendy Curiel was working as a Protective Services
20  Supervisor in the Child Abuse Hotline/Emergency Response Stand-by Program.  (*Curiel*
21  *Dec.* [Doc. 42-3], ¶ 2.)  Throughout the afternoon and evening, Curiel had been talking
22  to Owens about what she "learned from speaking with Dr. Siano and others regarding"
23  R.S.'s injuries.  (*Id.*, ¶ 4.)  Based on those conversations, Curiel understood Joanna
24  reported receiving a call from R.S.'s daycare about being injured as a result from
25  "possibly . . . falling on the trampoline or from allergies," but Dr. Siano stated that the
26  injuries "appeared to be intentionally inflicted."  (*Id.*, ¶¶ 4, 5.)  Curiel was informed that
27  R.S. was not taken to the doctor until the following day, and that Dr. Siano referred
28  Joanna to the emergency room for additional testing.  (*Id.*, ¶¶ 5, 6.)  Because R.S.'s

injuries were non-accidental, Curiel was concerned for her safety and "wanted to find out the results from the additional testing at the hospital before deciding what action (if any) the Agency should take." (*Id.*, ¶ 6.)

Later, Owens informed Curiel that the Swartwoods went "to the Kaiser ER, but the parents decided not to have any additional testing done." (*Curiel Dec.*, ¶ 7.) Additionally, Owens stated that even though the parents said the injuries first appeared while R.S. was at daycare and were told the injuries "appeared to be intentionally inflicted, Ms. Swartwood asked Ms. Owens whether she should bring the children back to daycare the following day." (*Id.*) Curiel, therefore, decided to send a social worker to meet the Swartwoods at the hospital, and told Owens to ask the hospital to hold the family until a social worker could meet with them. (*Id.*) According to Curiel, such requests are "standard" and are "routinely followed" by the hospitals. (*Id.*) However, "the hospital told Ms. Owens they would not hold the family there and that the family was being discharged." (*Id.*)

At some point in the evening, Curiel called Defendant Maya Bryson, who was working as an on-call Senior Protective Services employee that evening. (*Curiel Dec.*, ¶ 8; *Bryson Dec.* [42-2], ¶ 2.) Curiel told Bryson about Owen's report of R.S.'s injuries and assigned her the case. (*Bryson Dec.*, ¶ 3; *see Curiel Dec.*, ¶ 13.) Bryson contends that she reviewed Owens' report and was told by Curiel that the pediatrician had referred R.S.'s parents to the emergency room for further testing, "which could include a scan of the child's head . . . and full body x-rays[.]" (*Id.*, ¶¶ 3, 5.) Curiel also stated that the parents had taken R.S. to the emergency room, but had left "without having the additional testing done." (*Id.*, ¶ 6.) Curiel asked Bryson to go the parents' house to interview them and to determine if the child was safe. (*Id.*, ¶ 6.)

**D.     Bryson and Curiel decide to place the children into protective custody.**

The Swartwoods returned home after being released from the hospital. Steven and Joanna knew from the conversation with Owens that a social worker was going to

their house.  The Swartwoods assumed the social worker was being sent to discuss the situation at daycare.  (*Joanna Dec.*, ¶ 13; *Steven Dec.*, ¶ 7.)

Sometime after 9:30 p.m., Bryson arrived at the Swartwood's home with three uniformed police officers.  (*Bryson Dec.*, ¶ 8.)  Believing she was there to discuss the daycare, Steven and Joanna invited her and the officers into their home.  (*Joanna Dec.*, ¶ 13; *Steven Dec.*, ¶ 7.)  Bryson then asked to see R.S., who was sleeping.  (*Joanna Dec.*, ¶ 14; *Bryson Dec.*, ¶ 9.)  According to Joanna, Bryson "demanded" that Joanna disrobe R.S. so Bryson could visually inspect her.  (*Joanna Dec.*, ¶ 14.)  During the inspection, Bryson took photographs of R.S.  (*Id.*; *Bryson Dec.*, ¶ 11.)  Later, Bryson demanded them to wake up and disrobe D.S. so she could also exam him.  (*Joanna Dec.*, ¶ 18; *Bryson Dec.*, ¶ 16.)

While Joanna rocked R.S. back to sleep, Bryson began interviewing Steven. (*Joanna Dec.*, ¶ 15; *Steven Dec.*, ¶ 9.)  Steven recounted the previous days events with Bryson.  He picked up R.S. from daycare, noticed a "weird rash" on her face, and was told by the home daycare provider that they "didn't know what had happened but that she may have fallen on the trampoline."  (*Bryson Dec.*, ¶ 13.)  Steven also indicated that over the past few days, D.S. began "crying his eyes out" about having to go to daycare. (*Id.*)  He told her they went to the emergency room, and declined the additional testing because they were concerned about the risks of radiation and the possibility of tumors. (*Id.*; *Steven Dec.*, ¶ 11.)  Bryson asked why R.S. was not taken to the doctor immediately after they noticed her injuries.  (*Bryson Dec.*, ¶ 13.)  Steven did not respond, though he had informed her earlier that when they arrived home from daycare, R.S.'s demeanor "'seemed fine.' 'She was not groggy[.]' 'It didn't seem . . . real bad.'"  (*Pls' Sealed Exhibits*, Ex. 7 at p. 3.)  Steven also denied being rough or aggressive with the children, and denied grabbing R.S. by the face or doing anything else that would have caused the injuries.  (*Bryson Dec.*, ¶ 13.)

Bryson then interviewed Joanna, whose statements regarding the events on May 16 and May 17 were consistent with Steven's statements.  (*See Bryson Dec.*, ¶ 14.)

1  Bryson again asked why R.S. was not taken to the doctor immediately.  (*Id.*, ¶ 14.)
2  Joanna stated that she "immediately called the Kaiser Nurse Line" and obtained the
3  first available appointment.  (*Joanna Dec.*, ¶ 16; *Bryson Dec.*, ¶ 14; *Pls Sealed Exhibits*,
4  Ex. 7 at p. 1.)  Joanna also denied any physical discipline at the home, denied ever
5  grabbing R.S. in an aggressive or abusive manner, and denied ever seeing Steven do so.
6  (*Id.*)  Bryson then told Joanna that she was "concerned that R.S. was not thoroughly
7  evaluated medically, given the extensive injuries to her face[.]"  (*Bryson Dec.*, ¶ 15.)

8      After examining the children and interviewing the parents, Bryson contends she
9  was concerned about the children's safety because "R.S. was a pre-verbal child who had
10  extensive, serious facial injuries that had been, according to doctors, intentionally
11  inflicted, and her caretakers (her parents) could not explain how she got injured."
12  (*Bryson Dec.*, ¶ 17.)  Bryson then walked outside the home and called Curiel to discuss
13  the investigation.  (*Id.*, ¶ 18.)  The two decided that R.S. and D.S. should be taken into
14  protective custody.  (*Id.*; *Curiel Dec.*, ¶ 15.)

15      Bryson went back into the home and told the Swartwoods that she was removing
16  the children and placing them in protective custody at the Polinsky Children's Center.
17  (*Joanna Dec.*, ¶ 20; *Bryson Dec.*, ¶¶ 19-20.)  The Swartwoods pleaded with Bryson not
18  to take the children, provided her with Shelly McChosum's (the home daycare owner)
19  phone number and asked Bryson to call Shelly so she could confirm that R.S.'s injuries
20  occurred while at daycare.  (*Joanna Dec.*, ¶ 20; *Bryson Dec.*, ¶ 19.)  The Swartwoods also
21  proposed leaving the children with the grandparents.  (*Joanna Dec.*, ¶ 20.)  Bryson
22  refused.  (*Id.*)  According to Bryson's declaration, "the role of the stand-by worker is not
23  to conduct lengthy investigations which may take numerous hours or potentially days
24  or weeks . . . .  My role as a stand-by worker was to make a decision based on the
25  evidence I learned at the home, as well as the evidence the Agency learned from the
26  referral and from speaking to the reporting parties."  (*Bryson Dec.*, ¶ 20.)

27
28

**E.     D.S. and R.S. are subjected to further medical exams without notifying their parents.**

Bryson took R.S. and D.S. to the Polinksy Children's Center, a San Diego County emergency shelter and group home.  They arrived sometime between midnight and 1:00 a.m.  (*Bryson Dec.*, ¶ 22.)  At approximately 2:00 a.m., R.S. and D.S. were examined by the nursing staff for things that were "[c]ontagious or need medical attention immediately."  (*Pls.' Sealed Exhibits*, Ex. 19 at PCC 057; Ex. 29 at PCC 046; Ex. 32 at p. 143.)  D.S. then had urine taken for drug testing.  (*Id.*, Ex. 29 at PCC 048–051.)

At 3:25 a.m., a plastic bag with adhesive and cotton balls was placed around the front part of R.S.'s genitals in order to obtain a urine sample for drug testing.  (*Pls' Sealed Exhibits*, Ex. 19 at PCC 063, PCC 065, PCC 069; Ex. 32 at pp. 169–170.) However, as of 8:50 a.m., not enough urine was collected so more cotton balls were applied.  (*Id.*, Ex. 19 at PCC 063.)  Finally, at 12:40 p.m. a sample was collected.  (*Id.*) Both D.S.'s and R.S's urine tests came back "negative" for drugs.  (*Id.*, Ex. 19 at PCC 065; Ex. 29 at PCC 050.)

At some point during the day, Dr. Wendy Wright, a Board certified child-abuse specialist, conducted a medical exam on R.S. and D.S.  (*Dr. Wright Dec.* [Doc. 42-12], ¶ 10.)  The exams involve the examination of "22 items," including the children's genitalia and rectum.  (*Pls' Sealed Exhibits*, Ex. 19 at PCC 060; Ex. 29 at PCC 047; Ex. 34 at p.60.)  During R.S.'s exam, which confirmed Dr. Siano's and Dr. Dohrenwend's findings that her injuries were non-accidental, R.S. was uncooperative.  (*Id.*, Ex. 19 at PCC 060; *Dr. Wright Dec.*, ¶ 10.)

The next day, Wednesday May 19, Dr. Wright accompanied R.S. to Kaiser hospital to undergo a skeletal exam.  (*Pls' Sealed Exhibits*, Ex. 19 at PCC 053, PCC 062, PCC 063, PCC 066.)  Before going, the Agency was specifically advised that the parents declined to allow the testing.  (*Rollins Dec.* [Doc. 42-9], ¶ 15.)  R.S. was tested anyway, and the results were normal.  (*Pls' Sealed Exhibits*, Ex. 19 at PCC 066.)

**F.    The investigation and continued detention of R.S. and D.S.**

On the morning of May 18, 2011, Defendant Susan Solis was a supervisor in the Agency's Court Intervention Unit.  (*Solis Dec.* [Doc. 42-11], ¶ 2.)  When she arrived to work, Solis was told the Agency had removed two children from their parents' custody the night before.  (*Id.*, ¶ 3.)  The case was assigned to Solis's unit "for an investigation to determine whether the children, whose last name was Swartwood, should be returned to their parents' care, or whether the Agency should file a petition in Juvenile Court requesting continued detention out of home."  (*Id.*)  The Agency's policy, which Solis believed was based on state law, provided her unit with 48 hours to make a decision.  (*Id.*)  Because the removal occurred "after hours," Solis believed the 48-hour window began at 8:00 a.m. on the morning after removal.  (*Id.*)

At approximately 9:00 a.m., Solis assigned the Swartwood case to Court Intervention social worker Defendant Kelly Rollins.  (*Rollins Dec.* [Doc. 42-9], ¶ 3.) Rollins was responsible for investigating the facts surrounding the removal and, with the assistance of Solis and the Juvenile Dependency County Counsel, determining if there was sufficient grounds to believe the children were not safe with their parents and, therefore, should be further detained.  (*Id.*)  Rollins also believed she had 48 hours, beginning at 8:00 a.m. that morning to make the determination.  (*Id.*)

Rollins talked briefly to Solis about the case and then read the data on the computer regarding the matter, which consisted of Owens' and Bryson's reports. (*Rollins Dec.*, ¶ 5.)  Shortly thereafter, Rollins was told that the children's grandparents had gone to the Polinsky Children's Center and wanted to talk to someone.  (*Id.*, ¶ 6.) Rollins drove to the center and spoke with the grandparents.  (*Id.*)  They expressed surprise about the removal and stated that they had no concerns about the parents' treatment of the children (*Id.*) )  After talking to the grandparents, Rollins visited the children.  (*Id.*, ¶ 7.)

At about 12:45 p.m., Rollins received a phone call from Dr. Ireland and Dr. Siano.  (*Pls' Sealed Exhibits*, Ex. 11 at p. 6.)  The doctors "were upset about the

removal." (*Rollins Dec.*, ¶ 11.)  Dr. Ireland said "she had no concerns whatsoever regarding the family" and that the parents "are very attentive with appropriate concerns." (*Id.*; *Pls' Sealed Exhibits*, Ex. 7 at p. 12.)  She also relayed that Dr. Siano "had no concerns whatsoever about the family[.]" (*Pls' Sealed Exhibits*, Ex. 7 at p. 12.) According to Dr. Ireland's medical notes, Rollins stated that someone at the Agency was under the impression that Steven and Joanna had left the emergency room the previous night against medical advice ("AMA").  (*Pls' Sealed Exhibits*, Ex. 11 at p. 6.) Dr. Ireland informed Rollins that based on her review of the charts, there was no mention that they left AMA.  (*Id.*)  Additionally, the "doctors told [Rollins] it was their impression from reading the medical notes that the ER doctor approved the parents getting a second opinion from Dr. Ireland the next day regarding the additional testing." (*Rollins Dec.*, ¶ 11.)

After lunch, Rollins went to the Swartwood home to interview the parents.  (*Pls' Exhibits*, Ex. 25 at p.1; *Rollins Dec.*, ¶ 8.)  The parents retold the story about Joanna dropping the children off at the home daycare, receiving the call about R.S.'s injuries, contacting the nurse hotline that night, and getting the first available appointment with Dr. Siano.  (*Id.*)  Rollins was also told about the exams with Dr. Siano and Dr. Dohrenwend.  (*Id*)  The parents were very upset about the removal.  (*Id.*)  Rollins told them she would be meeting with County Counsel the following day to decide whether to proceed to court.  (*Id*)

During the interview, Rollins provided a form entitled "Consent for Treatment - Parent," which Joanna signed.  (*Rollins Dec.*, ¶ 10; *Defs' NOL*, Ex. D (sealed) [Doc. 44], Ex. E (sealed) [Doc. 44].)  The form gave the County permission to provide "treatment" to D.S. and R.S. while they were "in any facility operated by the Health and Human Services Agency . . . ***if the treatment is recommended*** by a licensed physician, dentist, psychiatrist or other mental health practitioner."  (*Def.s NOL*, Ex. D (sealed), Ex. E. (sealed) (emphasis added).)  However, Joanna also checked a box on the form stating that she preferred for any "treatment" to be provided by the children's

regular pediatrician, Dr. Ireland. (*Id.*) Rollins also discussed the recommendation for a skeletal exam for R.S., but "the Swartwoods did not agree[.]" (*Rollins Dec.*, ¶ 9.) Rollins returned to her office and spoke briefly with Solis to update her about the case. (*Id.*, ¶ 10.)

Later, Rollins drove to the children's daycare and spoke to the owners, Shelly and Dan McCoshum. (*Rollins Dec.*, ¶ 12.) Shelly reported that R.S. and D.S. were jumping on the trampoline with other children shortly before lunch, "when [R.S.] began to cry very loudly." (*Pls' Sealed Exhibits*, Ex. 7 at p. 5.) Shelly stated that she did not see the actual incident, and therefore was not sure if R.S. "hit her face on [D.S.'s] knee, or if she ran into the netting around the outside of the" trampoline. (*Id.*) However, R.S. "was crying very loudly, and her face was very red." (*Id.*) R.S. eventually calmed down and ate lunch, but after waking up from a nap, Shelly "realized that [R.S.'s] face was still quite red, so she called" Joanna. (*Id.*, at p. 6.) Shelly further confirmed that R.S. did not have any marks on her face when she arrived at daycare. (*Rollins Dec.*, ¶ 12.) Shelly also denied that they caused the bruising by hitting or grabbing R.S. and denied seeing anyone else do so. (*Id.*) Rollins then returned to her office and called Dr. Wright, who stated that R.S.'s injuries were not consistent with Shelly's explanation. (*Id.*, ¶ 13.) Rollins concedes that by the end of the day, it appeared that the daycare was the place where R.S.'s injuries occurred. (*Id.*, ¶ 14.)

On the morning of May 19, Rollins received a phone call from "someone at Polinsky" stating that they were sending R.S. to have the skeletal x-rays done. (*Rollins Dec.*, ¶ 15.) Rollins informed the caller that the parents did not agree to the exam. (*Id.*) Later, Rollins was informed that the skeletal exam came back normal, with no concerns. (*Id.*, ¶ 20.)

Rollins then discussed the case with Solis. They remained concerned because no one had admitted causing R.S.'s injuries, nor did anyone say they saw someone else cause them. (*Id.*, ¶ 17; *Solis Dec.*, ¶ 7.) Additionally, they wondered if it was possible

1    that one of the parents grabbed R.S.'s face just before dropping her off at daycare, and

2    that the marks did not show up until later.  (*Solis* Dec., ¶ 7.)

3         Rollins then met with County Counsel to discuss her findings.  (*Rollins Dec.*, ¶

4    19.)  They also discussed the timing of the "event causing the injury" and whether one

5    of the parents could have grabbed R.S.'s face just before dropping her off at daycare.

6    (*Id.*)  They, therefore, consulted with Dr. Wright and Dr. Premi Saresh, another child

7    abuse expert.  (*Id.*)  Both doctors said "the marks on R.S.'s face would have shown up

8    right away, so it was probable that the injury-causing event happened very close to the

9    time the marks were notice[d] on [R.S.'s] face[.]" (*Id.*)  Based on this evidence, "the

10   decision was made not to proceed with a petition to the Juvenile Court, and [Rollins]

11   immediately notified the Swartwoods that their children were being released back into

12   their care.  (*Id.*, ¶ 20.)

13

14        **G.**    **The Swartwoods file this lawsuit against the County and Individual**

15              **Defendants.**

16        On July 3, 2012, Plaintiffs filed this lawsuit against the County and Individual

17   Defendants.  Plaintiffs allege Defendants Bryson and Curiel violated D.S. and R.S.'s

18   Fourth Amendment rights and the family's Fourteenth Amendment rights as a result

19   of the unlawful removal without a warrant.  Plaintiffs further allege that Defendants

20   Rollins and Solis violated the same constitutional rights by failing to release the

21   children after it became clear that they did not need to be protected from Steven and

22   Joanna.  As for the County, Plaintiffs allege constitutional violations arising out of the

23   County's policy of conducting medical exams on children admitted to the Polinsky

24   Children's Center without notice and outside the presence of the children's parents.

25   Plaintiffs also seek to hold the County liable for the Individual Defendants' conduct

26   under <u>Monell v. New York City Department of Social Services</u>, 436 U.S. 658 (1978)

27        In their cross-motions for partial summary judgment, the Individual Defendants

28   contend they are entitled to qualified immunity under federal and state law.  The

County argues that it is not liable under <u>Monell</u> because the Individual Defendants did not violate any constitutional rights and because no County policy or practice contributed to any alleged violation. The County further argues that its medical exam policies do not violate the Fourth and Fourteenth Amendments.

Plaintiffs' motion seeks partial summary judgment against the Individual Defendants on the basis that the undisputed facts establish violations of the family's Fourth and Fourteenth Amendment rights. Plaintiffs also seek partial summary judgment against the County on the grounds that its medical policies led to a violation of the same constitutional rights.

## II.   STANDARD

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. <u>See</u> Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986); <u>Freeman v. Arpaio</u>, 125 F.3d 732, 735 (9th Cir. 1997). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson</u>, 477 U.S. at 248.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. <u>Celotex</u>, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. <u>Id.</u> at 322–23. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." <u>T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n</u>, 809 F.2d 626, 630 (9th Cir. 1987).

"The district court may limit its review to the documents submitted for the purpose of summary judgment and those parts of the record specifically referenced therein." Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1030 (9th Cir. 2001). Therefore, the court is not obligated "to scour the record in search of a genuine issue of triable fact." Keenan v. Allen, 91 F.3d 1275, 1279 (9th Cir. 1996) (citing Richards v. Combined Ins. Co., 55 F.3d 247, 251 (7th Cir. 1995)).

If the moving party meets its initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir. 1995) (citing Anderson, 477 U.S. at 252) ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient."). Rather, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (quoting Fed.R.Civ.P. 56(e)).

When making this determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. See Matsushita, 475 U.S. at 587. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." Anderson, 477 U.S. at 255.

## III.   DISCUSSION

The issues raised in the parties' motions can be divided into four events: (1) the claim against Bryson and Curiel regarding their decision to remove R.S. and D.S. from Joanna and Steven's custody; (2) the claim against Rollins and Solis for the continued detention of R.S. and D.S.; (3) the claim against the County for not allowing Steven

or Joanna to attend R.S. and D.S.'s medical exams; and (4) the claim against the County for conducting the medical exams without parental notice or consent.

### A.   Bryson and Curiel's decision to remove the children from the Swartwood home.

Bryson and Curiel contend that their decision to remove R.S. and D.S. from their parents' custody was objectively reasonable because Bryson and Curiel reasonably believed the children were in imminent danger of serious physical harm.  (*Defs' MSJ* [Doc. 42-1], 10: 7-8.)  Accordingly, Bryson and Curiel seek summary judgment based on qualified immunity.  (*Id.*, 11 :1-2.)

Plaintiffs argue that the undisputed facts establish there was no reasonable cause to believe R.S. or D.S. were in imminent danger of serious bodily injury.  (*Pls' MSJ Re. Indiv. Defs.* [Doc. 45-1], pp. 15–16.)  Plaintiffs, therefore, seek partial summary judgment against Bryson and Curiel for violating R.S. and D.S.'s Fourth Amendment rights, and the family's Fourteenth Amendment rights.  (*Id.*, p.19.)

"Parents and children have a well-elaborated constitutional right to live together without governmental interference."  Wallis v. Spencer, 202 F.3d 1126, 1136 (9th Cir. 2000).  "The Fourteenth Amendment guarantees that parents will not be separated from their children without due process of law except in emergencies."  Mabe v. San Bernardino Cnty., Dept. of Pub. Soc. Serv.s, 237 F.3d 1101, 1107 (9th Cir. 2001). "Officials violate this right if they remove a child from the home absent information at the time of the seizure that establishes reasonable cause to believe that the child is in imminent danger of serious bodily injury and that the scope of the intrusion is reasonably necessary to avert that specific injury."  Rogers v. Cnty. of San Joaquin, 487 F.3d 1288, 1294 (9th Cir. 2007) (citations and internal quotation marks omitted).

"The Fourth Amendment also protects children from removal from their homes absent such a showing."  Rogers, 487 F.3d at 1294 (citing Dow v. Lebbos, 348 F.3d 820, 827 n.9 (9th Cir. 2003)).  "Officials, including social workers, who remove a child from

1   its home without a warrant must have reasonable cause to believe that the child is likely
2   to experience serious bodily harm in the time that would be required to obtain a
3   warrant." Id. (citing Mabe, 237 F.3d at 1108). "[T]he same legal standard applies in
4   evaluating Fourth and Fourteenth Amendment claims for the removal of children."
5   Wallis, 202 F.3d at p.1137 n. 8. With these principles in mind, the Court addresses the
6   parties' arguments.

7
8                  **1.     Qualified immunity.**

9        Qualified immunity protects government officials from liability for civil damages
10  as long as "their conduct does not violate clearly established statutory or constitutional
11  rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S.
12  223, 231 (2009) (citing Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "Qualified
13  immunity balances two important interests—the need to hold public officials
14  accountable when they exercise power irresponsibly and the need to shield officials from
15  harassment, distraction, and liability when they perform their duties reasonably." Id.
16       A public official is entitled to qualified immunity "unless the official's conduct
17  violated a clearly established constitutional right. [Citation omitted.]" Pearson, 555
18  U.S. at 232. In Saucier v. Katz, 533 U.S. 194 (2001), the Supreme Court mandated a
19  two-step approach to evaluating qualified immunity. First, the court must decide if the
20  facts make out a violation of a constitutional right. Id. at 201. If so, the second step
21  is whether the right at issue was "clearly established" at the time of the official's alleged
22  misconduct. Id. Whether the governing law was clearly established and whether
23  specific facts constitute a violation of established law are legal determinations. Mabe,
24  237 F.3d at 1106 (citations omitted).
25       However, Saucier's two-step approach is no longer mandatory. Pearson, 555 U.S.
26  at 236. Instead, district courts may exercise discretion in deciding which of the two
27  prongs should be addressed first. Id. The Court will follow Soucier's approach.
28

a.   *Was there a violation of a constitutional right?*

The first issue is whether Bryson and Curiel's removal of R.S. and D.S. from their parents' custody violated Plaintiffs' constitutional rights.  There is no dispute that Bryson and Curiel did not have a warrant when they removed R.S. and D.S. from the Swartwoods' home.  Thus, Bryson and Curiel violated Plaintiffs' constitutional rights unless, at the time of removal, they believed R.S. and D.S. were in imminent danger of serious bodily injury from Steven or Joanna and that the scope of the intrusion was reasonably necessary to avert the specific injury.  Wallis, 202 F.3d at 1138.

In their moving papers, Defendants contend six facts justify the warrantless removal of the children: (1) R.S. was a pre-verbal child who suffered bruising on her face; (2) doctors had determined that R.S.'s injuries were intentionally inflicted; (3) the parents could not explain how the injuries occurred; (4) her parents "had not brought R.S. for medical treatment on the day the injuries were discovered"; (5) the parents left the emergency room without having the additional testing done that Dr. Siano recommended; and (6) the parents were still considering taking the children back to daycare the next day.[4] (*Defs.' MSJ*, p. 10.)

The primary problem with Defendants' argument is that there was no basis to believe Steven or Joanna caused R.S.'s injuries.  The Supreme Court "has frequently emphasized the importance of the family[,]" referring to the right to "raise one's children" as "essential," a "basic civil right[] of man," and "far more precious . . . than property rights."  Stanley v. Illinois, 405 U.S. 645, 651 (1972) (citations omitted). Given this "essential" civil right, it is difficult to conceive of a situation where the state

---

[4] At the start of the motion, Defendants contend that three facts justify the removal: "Exigent circumstances justified the removal of the [R.S.] and her three year-old brother because the girl was pre-verbal, she had injuries to her face, and her parents could not explain how the injuries occurred."  (*Defs' MSJ*, at p.1.)  This argument appears consistent with Bryson's declaration, in which she contends "she was concerned about the children's safety" because "R.S. was a pre-verbal child who had extensive serious facial injuries that had been, according to the doctors, intentionally inflicted, and her caretakers (parents) could not explain how she got injured."  (*Bryson Dec.*, ¶ 17.)  Bryson does not cite the other 3 factors as a basis for removal.  Nevertheless, the Court will assume that Bryson also relied on those factors.

may remove a child from his or her parents' custody without a warrant, in the absence of some indication that the parents had a role in the child's injuries, whether by affirmative conduct (e.g., striking the child) or neglect (e.g., failing to supervise or protect). The reason is obvious: without such an indication, there is simply no basis for a government official to believe the child is in imminent danger from the parents.

In Arce, plaintiffs appealed the dismissal of their section 1983 claim for the warrantless removal of their children. In granting defendants' motion, the trial court concluded as a matter of law, the warrantless seizure did not violate plaintiffs' rights because the complaint alleged the child was "diagnosed with Shaken Baby Syndrome," which the court found established that officials "had reasonable cause to believe the children were likely to experience serious bodily harm if left in their parents' custody." Id. at 1474–75.

On appeal, the Court of Appeal reasoned that "[i]mplicit in the court's ruling is a finding that reasonable cause existed to believe that the parents were responsible for A.L.'s injuries." Id. at 1475. The court then rejected the contention that the nature of the injury was sufficient to support that belief:

> In sum, although we do not dispute that Shaken Baby Syndrome is a serious, life-threatening injury, we disagree with the County defendants' assertion that a child may be detained without prior judicial authorization based solely on the fact that he or she has suffered a serious injury. Rather, the case law demonstrates that the warrantless detention of a child is improper unless there is 'specific, articulable evidence' that the child would be placed at imminent risk of serious harm absent an immediate interference with parental custodial rights. [Citation.] It follows that, if a child suffers a serious injury, and there is no reasonable cause to believe that the parents either caused the injury or committed other conduct that places the child at imminent risk of harm . . . the state may not interfere with parental custody unless it obtains judicial authorization to do so.

Id. at 1481–82 (citing Wallis, 202 F.3d at 1138, and Ram, 118 F.3d at 1311). Because the complaint alleged the police and hospital's social workers did not suspect the parents caused the child's injuries, but instead the injuries may have been caused at the daycare, the Court of Appeal reversed. See also Croft v. Westmoreland County

1  Children and Youth Services, 103 F.3d 1123, 1126 (3rd Cir. 1997) ("[A] state has no
2  interest in protecting children from their parents unless it has some reasonable and
3  articulable evidence giving rise to a reasonable suspicion that a child has been abused
4  or is in imminent danger of abuse. [Citations omitted.]")

5  Defendants' theory in this case is similar to the theory in Arce.  Bryson and
6  Curiel contend that the removal was justified because of the nature of R.S's injuries, her
7  age, and the parents' inability to explain how the injuries occurred.  Implicit in this
8  argument is the assumption that Steven and Joanna's inability to offer an explanation
9  reasonably suggested they caused R.S.'s injuries.  But this assumption was undermined
10  by Steven and Joanna's explanation that the injuries occurred at daycare.  The
11  explanation was also consistent with the parents' statement to Bryson that D.S. had
12  recently begun "crying his eyes out" about going to daycare.  (Bryson Dec., ¶ 13.)  The
13  issue, therefore, is whether there was any reason for Bryson or Curiel to believe the
14  parents were lying.  Defendants have not identified any facts that would support such
15  a belief.  And the record is devoid of any evidence suggesting that Dr. Siano, Dr.
16  Dohrenwend, Nurse Fowler, or Owens believed the parents were being untruthful.

17  Even more troubling—given the lack of evidence suggesting the parents were
18  lying—is that before the children were removed, Bryson had an opportunity to attempt
19  to verify the parents' story.  Steven and Joanna gave Bryson the home daycare owner's
20  telephone number and pleaded with her to call and verify that R.S.'s injuries occurred
21  there.  Bryson refused.  In her declaration, Bryson appears to offer an explanation as to
22  why she would not call: "the role of the stand-by worker is not to conduct lengthy
23  investigations which may take numerous hours or potentially days or weeks."  (Bryson
24  Dec., ¶ 19.)  The explanation is insufficient for two reasons.

25  First, there is no dispute that a telephone call takes seconds or minutes, not
26  hours, days or weeks.  Second, a child suspected of being abused or neglected cannot
27  be removed "unless reasonable avenues of investigation are first pursued."  Wallis, 202
28  F.3d at 1138 (citing Sevigny v. Dicksey, 846 F.2d 953, 957 (4th Cir. 1988)).

Accordingly, because there was no evidence Steven or Joanna abused R.S., Bryson and Curiel were required to pursue reasonable avenues of investigation before removing the children. Whether a reasonable avenue exists " depends in part upon the time element and nature of the allegations." Id. Taking into consideration the time, the nature of the allegations, and the effort required to make the telephone call, the Court finds attempting to call the home daycare owner was a reasonable avenue of investigation that Bryson or Curiel were required to pursue before removing the children.[5]

Defendants nevertheless argue that because Wallis involved the removal of children by police officers, who have "different roles and duties" than social workers, the requirement to first pursue reasonable avenues of investigation does not apply to them. (Defs' Opp. Re. Indiv. Defs. [Doc. 52], p. 8.) The Court disagrees. Although police officers and social workers generally have different roles and duties, in deciding whether to remove a child without judicial authorization, their roles are identical: determining whether there is reasonable cause to believe the child is in imminent danger. Nor do Defendants cite support for the assertion that a different standard applies depending on whether the decision to remove is made by a police officer, social worker or some other public official.

For all of these reasons, the Court finds Bryson and Curiel's reliance on the fact that R.S. was preverbal, suffered intentionally inflicted facial injuries and the parents could not explain how they occurred is insufficient.

Additionally, the remaining three facts relied upon by Bryson and Curiel—the delay in seeking medical treatment, decision to forgo additional testing and Joanna's alleged consideration about sending the children back to daycare—also fail to suggest

---

[5] Defendants argue that it is unclear whether anyone would have even answered the phone at the daycare or whether anyone would have been willing or available to talk to the Agency at that time of night. Defendants miss the point. Wallis requires officials to pursue reasonable avenues of investigation. What that investigation will uncover will always be unknown until it is actually pursued. Therefore, it is not a defense to assert that the investigation was unnecessary because it was unclear what would have been discovered.

that Steven and Joanna caused R.S.'s injuries or that the children were in imminent danger.  Bryson and Curiel knew that immediately after R.S. arrived home, Joanna contacted the Kaiser nurse line to seek medical advice about R.S.'s injuries and she obtained the first available appointment to see Dr. Siano.  (*Owens Dec.*, ¶ 3; *Defs' NOL*, Ex. A. (sealed) at p.1.)  Steven also informed Bryson that despite the injuries, R.S.'s demeanor "seemed fine," she "was not groggy" and the injuries did not seem "real bad." (*Pls' Sealed Exhibits*, Ex. 7 at p. 3.)   Additionally, Bryson and Curiel were also aware that the decision to forgo the additional testing was based on Dr. Dohrenwend's medical advice after he consulted with three different Kaiser pediatricians.  (*Owens Dec.*, ¶ 8; *see also Defs' NOL*, Ex. A (sealed) at p.2.)  Defendants also knew that the decision was based on the fact that R.S. "did not present with neurological problems or vomiting" and because the parents were concerned about "the amount of radiation involved. . . ."  (*Id.*)  Based on these undisputed facts, the parents' decisions regarding R.S.'s medical care do not support an inference that the parents caused R.S.'s injuries or posed a threat of imminent harm to their children.

As for Bryson and Curiel's contention that the removal was justified because the parents were purportedly considering sending the children back to daycare, this fact is unavailing for at least two reasons.   To begin with, the scope of the intrusion must be reasonably necessary to avert the specific injury.  <u>Wallis</u>, 202 F.3d at 1138.  Here, if the concern was that the children might be sent to daycare the next morning, the scope of the intrusion—removing the children—was not reasonably necessary to address the danger.  Rather, Bryson could have established a safety plan specifically preventing Steven and Joanna from sending the children to daycare.  (*See Fox Dec.* [Doc. 42-4], ¶ 6.[6])

---

[6] At paragraph 6, Ann Fox, a Protective Services Program Manager, stated that since 2011, the Agency uses "safety plans," which are "agreements, usually between parents and the Agency, for parents to take specific actions, or prevent specific actions from taking place, with the intent of keeping a child in their home rather than removing them."  (*Fox Dec.*, ¶ 6.) Additionally, during her deposition, Solis confirmed that she wondered "why were the children

Furthermore, Defendants' contention that this fact justified removal lacks merit. Although there is no dispute that Joanna asked Owens "if she should send the children back to the daycare tomorrow," Joanna also "asked [Owens] if she should contact the daycare provider to inform them about the children not attending tomorrow." (*Owens Dec.*, ¶ 10.)  At best, this evidence indicates Joanna was unsure about what to do.  Yet, there is no indication in Bryson's declaration that she ever asked the Swartwoods if they intended to return the children to daycare, ever expressed any concern about the children returning to daycare or raised the issue at all with Steven or Joanna.  The complete absence of the issue from Bryson's declaration contradicts the contention that she relied on this fact as a basis for removal.  Moreover, Defendants fail to explain how Joanna's uncertainty about whether to send the children back to daycare is evidence the parents caused R.S.'s injuries or that the children were in imminent danger.[7]

Finally, not only do the six facts cited by Defendants fail to support an inference of imminent harm, but the information obtained from the reporting parties—i.e., the medical professionals who examined R.S.—contradict the belief that the children were in imminent harm.  There is no dispute Dr. Siano did "not have any suspicions that the abuse came from the family of origin based on what [Joanna]" reported.  (*Defs' NOL*, Ex. A (sealed) at p.1.)  Dr. Siano also stated that Joanna acted appropriately (i.e., becoming tearful and upset) after hearing that R.S.'s injuries were non-accidental.  (*Id.*;

---

removed in the first place" and stated that believed that there were "other ways this could have been handled[,]" such as "[p]utting a safety plan in place and not removing the children . . . ." (*Solis Dep.* [Doc. 65-2], pp. 352–353 (attached to *Cox Dec. In Support of Pls.' Reply Re. Indiv. Defs.* [Doc. 65-1]).)

[7] The concern that the children might be returned to daycare is also unavailing because the alleged danger was not imminent.  To satisfy this standard, the social workers "must have reasonable cause to believe that the child is likely to experience serious bodily harm in the time that would be required to obtain a warrant." <u>Rogers v. County of San Joaquin</u>, 487 F.3d 1288, 1294 (9th Cir. 2007).  Here, there is no dispute that the children were removed around midnight, and thus would not be sent to school for six to eight hours.  There is no showing that Bryson and Curiel could not obtain a warrant before the children would be sent to daycare.

1  *see also Defs' MSJ*, p.3.)   Undisputably, Bryson was aware of these facts, which were

2  identified in Owens' first report, before she decided to remove the children. (*See Bryson*

3  *Dec.* ¶ 19.)

4        The information received from Kaiser hospital also did not support a finding of

5  imminent harm.   There is no dispute that Dr. Dohenwrend spent an hour and 45

6  minutes with the Swartwood family, examining R.S. and discussing her injuries with

7  Steven and Joanna.   Yet, when Owens asked "the hospital to hold the family until a

8  social worker came and met with them, which is a standard request we make of

9  hospitals and which *is routinely followed*[,]" the hospital refused and instead stated that

10 "the family was being discharged." (*Curiel Dec.*, ¶ 7, emphasis added.)   The hospital's

11 refusal to hold the family further suggests that neither Dr. Dohrenwend nor Nurse

12 Fowler believed the children were in imminent danger.

13       For these reasons, the Court finds Plaintiffs have established a violation of D.S.

14 and R.S.'s Fourth Amendment rights and the family's Fourteenth Amendment rights.

15

16                **b.**   <u>*Was the right clearly established?*</u>

17       In evaluating whether a right is "clearly established," the "relevant, dispositive

18 inquiry . . . is whether it would be clear to a reasonable officer that his conduct was

19 unlawful in the situation he confronted." <u>Saucier</u>, 533 U.S. at 202.  "If the law did not

20 put the official on notice that his conduct would be clearly unlawful, summary judgment

21 based on qualified immunity is appropriate." <u>Id.</u>

22       Defendants argue that Bryson and Curiel are entitled to qualified immunity

23 because the governing law was not clearly established when R.S. and D.S. were

24 removed. (*Defs' MSJ*, p. 12.)   They then repeat this argument in opposing Plaintiffs'

25 motion against the individual defendants: "Even if . . . the facts known by Bryson and

26 Curiel did not give them cause to believe the children were in imminent danger, the

27 Court should grant the workers qualified immunity because a reasonable social worker

28 would not know that removal was clearly unlawful in that situation." (*Defs' Opp. Re.*

*Indiv. Defs.*, p. 14.)   In support of this argument, Defendants contend that courts "should not conduct inquiry into whether a right is clearly established at a 'high level of generality'" and instead the "inquiry must be made in a more 'particularized sense' . . . and 'on a more specific level.'" (*Id.*, at p. 15, citing <u>Brosseau v. Haugen</u>, 543 U.S. 194, 199 (2004) and <u>Saucier</u>, 533 U.S. at 202.)   Accordingly, Defendants argue that because "[n]o case has held that in similar circumstances, in which a preverbal child has suffered intentionally inflicted facial injuries by an unknown perpetrator, exigency did not exist and it would be unlawful to remove the child from her parents' care," the law was not clearly established. (*Id.*, p. 16.)   The Court disagrees.

In <u>Rogers</u>, 487 F.3d 1288, the district court was faced with the same argument advanced by Bryson and Curiel.   The court granted the defendant social worker's summary-judgment motion for qualified immunity, "holding that the application of the law to medical neglect was not clearly established." <u>Id.</u> at 1297.

In reversing, the Ninth Circuit explained that "it is not necessary that a case be on 'all fours' with the facts of the instant case.   A right is clearly established if 'the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right." <u>Rogers</u>, at 1287 (citing <u>Saucier</u>, 533 U.S. at 202).   Because the court had "repeatedly held that a family's rights were violated if the children were removed absent an imminent risk of serious bodily harm[,]" the court held that a "reasonable social worker would need nothing more to understand that she may not remove a child from its home on the basis of a medical condition that does not present such a risk." <u>Id.</u>

Here, the law regarding the warrantless removal of a child was clearly established when Bryson and Curiel removed the children from the Swartwood home.   By "1993, it was clear that a parent . . . could not be summarily deprived of that custody without notice and a hearing, except when the children were in imminent danger." <u>Ram v. Rubin</u>, 118 F.3d 1306, 1310 (9th Cir. 1997).   The Ninth Circuit reaffirmed this holding in 2000 in <u>Wallis</u>, and instructed that "the scope of the intrusion" into the family's

liberty interest must be reasonably necessary to avert that specific injury. <u>Id.</u> at 1138 (citations omitted). <u>Wallis</u> also clarified that at the time of the removal, there must be "specific, articulable evidence that provides reasonable cause to believe that a child is in imminent danger of abuse," and officials must have pursued "reasonable avenues of investigation." <u>Id.</u> "Whether a reasonable avenue of investigation exists . . . depends in part upon the time element and the nature of the allegations." <u>Id.</u> Since <u>Wallis</u>, the Ninth Circuit has continued to confirm the exigency requirement. <u>See</u> <u>Mabe</u>, 237 F.3d at 1107; <u>Rogers</u>, 487 F.3d at 1294.

Indeed, although Defendants contend that the law was not clearly established, their moving papers and opposition to Plaintiffs' motion identify and argue the proper legal standard: reasonable cause to believe the children were in imminent danger. (*Defs.' MSJ*, pp. 8–9, 10, 12; *Defs.' Opp. Re. Indiv. Defs.*, p. 13.) For these reasons, the Court finds that at the time R.S. and D.S. were taken into protective custody without a warrant, the law was clearly established.

For these reasons, Bryson and Curiel are not entitled to qualified immunity.

## 2. <u>Plaintiffs' request for partial summary judgment against Bryson and Curiel.</u>

Having determined that Bryson and Curiel are not entitled to qualified immunity, the Court considers Plaintiffs' request for partial summary judgment against them. Specifically, Plaintiffs request a determination that Bryson and Curiel's conduct violated D.S. and R.S.'s Fourth Amendment rights and the entire family's Fourteenth Amendment rights.

In opposing Plaintiffs' motion, Bryson and Curiel raise two issues. First they contend that in order to be found liable, Plaintiffs must establish that their decision to remove the children was so "offensive and intentional as to 'shock the conscience.'" (*Defs.' Opp. Re. Indiv. Defs.* [Doc. 52], pp. 11–12, citing <u>Kulya v. City & Cnty. of San Francisco</u>, 2008 U.S. Dist. LEXIS 73952 at *21 (N.D. Cal. 2008).) Plaintiffs respond

1    that Defendants rely on the wrong legal standard and that the correct standard is an

2    "unwarranted interference."  The Court agrees with Plaintiffs.  See Crow v. Cnty. of

3    San Diego, 593 F.3d 841, 876 n.23 (9th Cir. 2010) (rejecting defendants' argument that

4    a "shocks the conscience" standard applies to a claim for the deprivation of familial

5    companionship, and stating that the standard is an "unwarranted interference") (citing

6    Lee v. Cnty. of Los Angeles, 250 F.3d 668, 685 (9th Cir. 2001)); McLaughlin v. Cnty.

7    of El Dorado, 2012 WL 5387883 (E.D. Cal. 2012) (rejecting defendants argument that

8    the shocks-the-conscience standard applies to a procedural due process claim of

9    removing children without due process of law).[8]

10          Second, Defendants argue that Plaintiffs are not entitled to summary judgment

11   because, under the totality of the circumstances, Bryson and Curiel had reasonable

12   cause to believe the children were in imminent danger.  (See Defs. Opp. Re. Indiv. Defs.

13   [Doc. 52], pp. 5–7.)  For the reasons discussed more thoroughly above, the Court finds

14   that reading the evidence in the light most favorable to Bryson and Curiel, the six facts

15   relied upon to remove the children do not support a reasonable belief that the parents

16   caused R.S.'s injuries or that the children were in imminent danger.  Given the

17   complete absence of such information, as well as the statements and conduct of the

18   medical staff who examined R.S. on May 17, the Court finds that Bryson and Curiel's

19   decision to remove the children without judicial authorization constituted an

20   unwarranted interference with the children's Fourth Amendment rights and the

21   family's Fourteenth Amendment rights.  Accordingly, Plaintiffs are entitled to partial

22   summary judgment against Bryson and Curiel.

23

24

25

---

26          [8] Also, in Rogers, 487 F.3d 1288, the Ninth Circuit reversed the district court's order
27   granting defendants summary-judgment based on qualified immunity and the denying plaintiffs'
     summary-judgment motion.  Id. at 1298.  Notably, in finding that plaintiffs were entitled to
28   summary judgment, the court did not refer to the shocks-the-conscience standard, instead
     focusing on if defendant had reasonable cause to believe the children faced imminent harm.

**B.    The continued detention of D.S. and R.S. by Rollins and Solis.**

Defendants argue that Rollins and Solis are entitled to qualified immunity because they "returned the children as soon as they learned the injury-causing act most likely occurred at the daycare, and their actions fell within child welfare social worker standards and practice." (*Defs. MSJ*, pp. 14-15.)  Plaintiffs counter that because by the end of the day on Wednesday, May 18, "there can be no reasonable dispute that the continued detention of the children was unreasonable and unconstitutional," partial summary judgment against Rollins and Solis is appropriate.  (*Pls.' MSJ Re. Indiv. Defs.* [Doc. 45-1], p. 22.)

**1.    Qualified immunity.**

**a.    *Was a constitutional right violated?***

The constitutional right at issue is the family's right to "live together without governmental interference." <u>Santosky</u>, 455 U.S. at 753; <u>Wallis</u>, 202 F.3d at 1136. Plaintiffs contend that in evaluating Rollins' and Solis' conduct, the Court should look to California Welfare & Institutions Code § 309, which Plaintiffs contend codifies the Fourth Amendment's and Fourteenth Amendment's limitations for continuing to detain children removed from their parents' custody.  Defendants do not appear to dispute that this section governs Rollins' and Solis' conduct.

Section 309 provides, in relevant part:

(a) Upon delivery to the social worker of a child who has been taken into temporary custody under this article, the social worker shall immediately investigate the circumstances of the child and the facts surrounding the child's being taken into custody and attempt to maintain the child's family through the provision of services.  The social worker shall immediately release the child to the custody of the child's parent, guardian, or responsible relative unless one or more of the following conditions exist:
                                    * * *
(2) continued detention of the child is a matter of immediate and urgent necessity for the protection of the child and there are no reasonable means by which the child can be protected in his or her home or the home of a responsible relative.

Cal. Welf. & Inst. Code § 309(a). Based on this language, there appear to be two issues in evaluating Rollins and Solis' conduct. First, whether they "immediately" conducted a reasonable investigation into the removal. Second, whether they "immediately release[d]" the children after determining that they were not in immediate and urgent need of protection from the parents.

The undisputed facts establish that shortly after learning that the Swartwood children were removed, Solis assigned the investigation to Rollins and the two discussed the case. Rollins then reviewed the notes on the computer, drove to the Polinsky Children's Center to meet with the grandparents, and then visited the children. She then returned to her office and talked to Dr. Ireland and Dr. Siano about R.S.'s examination the previous day. Shortly after lunch, Rollins drove to meet and interview Joanna and Steven, and then drove to the home daycare to interview the daycare owners. Rollins ended the day by processing the information learned.

The next day, Rollins and County Counsel contacted doctors specializing in child abuse and confirmed R.S.'s injuries would have manifested quickly after the event causing the injury. At that point, Rollins and County Counsel called the parents and released the children. Based on these undisputed facts, it is clear that Rollins and Solis complied with section 309(a)'s obligation to "immediately investigate the circumstances" of the children's removal.

The primary dispute is whether Rollins and Solis complied with section 309's additional mandate of "immediately releas[ing] the child to the custody of the child's parent" when it became apparent that the continued detention was not a matter of immediate and urgent necessity for the children's protection. With respect to this issue, the Court finds that reading all inferences in favor of Plaintiffs, a reasonable jury could conclude that Rollins and Solis did not.

As discussed more fully above, the information Rollins learned from Bryson's and Owens' reports did not support a finding that the parents played a role in R.S.'s injuries. The reports indicated that the physicians were not concerned about the parents, their

decision to forgo the additional testing was appropriate, and the parents reported R.S.'s injuries occurred at daycare. (*Defs' NOL*, Ex. A (sealed), p. 1.)  Rollins also knew Dr. Dohrenwend described R.S. "as an active and happy one year-old" and the hospital refused the Agency's request to hold the family.  (*Id.*, Ex. A at p.1; Ex. B and p. 1.)

Moreover, none of the information Rollins received from interviewing the parents, the daycare providers, the grandparents or Dr. Siano and Dr. Ireland—who Rollins characterized as "upset" about the removal—could reasonably have raised a concern about the parents.  In fact, Rollins admits that *all* of the information gathered during the first day of her investigation indicated R.S.'s injuries occurred at daycare.

Defendants, nevertheless, argue that Rollins had 48 hours to conduct her investigation and the continued detention was appropriate because Rollins had yet to confirm the timing of the injury-causing event.  Neither argument is persuasive.

First, in support of the claim that Rollins had 48 hours to decide whether to return the children, Defendants cite California Welfare & Institution Code § 313. However, that provision applies "whenever a minor is taken into custody by a peace officer or probation officer . . . ."  Bryson and Curiel do not contend that they were peace officers or probation officers.  Thus, section 313 does not apply.  Moreover, the language of section 309 explicitly provides that the children "shall" be "immediately release[d]" to the parents "unless" the continued detention is necessary to protect the children.   This requirement does not support Defendants' claim of a 48-hour investigative window.

Second, Rollins claim that she needed to confirm the timing of the injury-causing event before releasing the children is unavailing.  Section 309 requires "immediate" release unless there is grounds to believe the continued detention was a "matter of immediate and urgent necessity for the protection of the child. . . ."  Id.  Rollins and Solis have failed to identify any evidence supporting such a belief.  And under the facts of this case, taken in the light most favorable to the Swartwoods, a reasonable jury could conclude that verifying the timing of the injury-causing event was insufficient to

1   support a continued belief that the children needed to be protected. Thus, assuming

2   section 309 creates a federally protected liberty interest, the Court finds Rollins and

3   Solis have failed to establish Plaintiffs' constitutional rights were not violated.

4

5                     **b.    _Was the law clearly established?_**

6          The next issue is whether the law was clearly established at the time of the

7   violation. As an initial matter, unlike cases addressing a warrantless removal of a child,

8   there is a lack of authority regarding the legal standard applicable to the continued

9   detention of a child. Plaintiffs, however, contend that section 309(a) "bears" on the

10  issue of whether the continued detention of R.S. and D.S. constituted an unwarranted

11  interference with the Swartwoods' constitutional right to live together without

12  governmental interference. (*Pls.' MSJ Re. Indiv. Defs.*, p. 20.)  In support of this

13  contention, Plaintiffs rely on <u>Parkes v. County of San Diego</u>, 345 F.Supp.2d 1071 (S.D.

14  Cal. 2014). (*Id.*, pp. 21–22.) The Court is not persuaded.

15         In <u>Parkes</u>, plaintiffs sued social workers for the continued detention of the

16  children. In evaluating defendants' claim for qualified immunity, the district court used

17  section 309 to determine whether a constitutional right was violated. <u>Id.</u> at 1090.

18  However, at issue in <u>Parkes</u> was whether the social workers conducted an investigation

19  or evaluated whether there was a reasonable means by which to protect the children

20  while the mother remained in custody. <u>Id.</u> Thus, under <u>Parkes</u>, a reasonable social

21  worker would understand that they violate a family's constitutional rights if they do not

22  perform an immediate investigation into whether the children's continued detention

23  is necessary to protect them.

24         In contrast to <u>Parkes</u>, here, Plaintiffs do not contend that Rollins and Solis failed

25  to immediately conduct an investigation. Indeed, as explained above, the undisputed

26  facts support a finding that Rollins acted diligently during the first day in investigating

27  the children and the circumstances surrounding their removal. Instead, the issue is

28  whether Rollins and Solis had 48 hours to complete their investigation before making

a determination about whether to return the children to their parents. <u>Parkes</u> did not address that issue, nor have Plaintiffs pointed to any other authority on point. For this reason, the Court finds the law was not clearly established at the time Rollins and Solis investigated the continued detention of R.S. and D.S. For this reason, the Court finds Rollins and Solis are entitled to qualified immunity.

**C.    <u>Whether any of the Individual Defendants' conduct was pursuant to a County policy or practice.</u>**

The County also seeks partial summary judgment on Plaintiffs' claims for the removal of D.S. and R.S. from their parents' custody. The County raises two arguments in support of the motion.

First, the County argues that because the Individual Defendants did not violate Plaintiffs' rights, the County cannot be liable. (*Defs' MSJ*, p. 17.) Because this Court has found that Plaintiffs' rights were violated, the County's first argument lacks merit.

Second, the County contends that in order to be liable for the Individual Defendants' conduct, Plaintiffs must prove that their misconduct was pursuant to an official policy or practice. <u>See</u> <u>Monell</u>, 436 U.S. at 691. According to the County, because its policy requires a reasonable belief that the children are in imminent harm before a social worker may remove children without a warrant, the County contends Plaintiffs cannot prevail on their claim for <u>Monell</u> liability. (*Defs' MSJ*, p. 17.)

However, Rollins and Solis both stated that the County's policy provided them 48 hours to conduct an investigation before deciding whether to return R.S. and D.S. to their parents' custody. (*Rollins Dec.*, ¶ 3; *Sollis Dec.*, ¶ 3.) Accordingly, at the very least, a disputed issue of material fact exists as to whether the County's policy was the driving force in Rollins' and Solis' failure to return the children at the conclusion of the first day of investigation.

As for Bryson and Curiel, the County's own witnesses testified that their decision to remove the children was within the training and standards they received from the

1    County.  (*Lane Dec.* [Doc. 42-5], ¶ 3.)  Based on that testimony, another disputed issue

2    of fact exists regarding whether Bryson and Curiel's conduct was pursuant to a custom

3    and practices of the County.

4

5        **D.    The County's medical exams of R.S. and D.S.**

6        Plaintiffs contend that the County's policy for conducting medical examinations

7    on children admitted to the Polinsky Children's Center is unconstitutional for two

8    reasons: (1) the policy precludes parents from attending the medical exam; and (2) the

9    examination is performed without parental notice or consent, without a court order

10   regarding the specific child and in the absence of exigency.  Plaintiffs further contend

11   that the County's policy was the moving force in violating R.S. and D.S.'s Fourth

12   Amendment rights and the family's Fourteenth Amendment rights.  (*Pls.' Not. Mt. Re.*

13   *Cnty.* [Doc. 46], 2:12–20.[9])

14       The County admits that Steven and Joanna were not allowed to attend the

15   examination because of its policy: "there is no factual dispute about parental presence

16   at the Polinsky exams.  Parents are not allowed in the exam room when the Polinsky

17   exams are conducted, though they are allowed to visit their children in the visitation

18   area and speak to the doctors about their children's medical issues."  (*Defs.' Opp. Re.*

19   *Cnty.* [Doc. 53], p. 11.)  Instead, the County argues that partial summary judgment is

20   appropriate because R.S.'s and D.S.'s medical exams did not violate Plaintiffs'

21   constitutional rights for a number of reasons.  As for Plaintiffs' second claim, the

22   County does not address whether its medical-examination policy requires parental

23   notice or consent.  However, the County argues that its exams are authorized by law

24   and that Joanna consented to R.S.'s and D.S.'s exams.

25       Two Ninth Circuit cases control this Court's evaluation of the parties' claims.

26

27

28       [9] The Court interprets Plaintiffs' motion as presenting an as-applied challenge to the
     County's policy, as opposed to a facial challenge.

1        In <u>Wallis</u>, 202 F.3d 1126, police officers removed children from their parents'

2   custody based on a mental patient's statements that the father intended to sacrifice his

3   son in a ritual to Satan.  Three days after the children were removed, an evidentiary

4   physical exam was performed, which included internal body cavity examinations.  The

5   exams were performed without notice to the parents.  Ultimately, a court ordered the

6   children returned to the parents, who then filed suit against the County.  The district

7   court granted the County's summary-judgment motion, and plaintiff's appealed.

8        In reversing the district court, the Ninth Circuit explained that "[p]arents and

9   children have a well-elaborated constitutional right to live together without

10  governmental interference."  <u>Wallis</u>, 202 F.3d at 1136 (citations omitted).  This

11  "includes the right of parents to make important medical decisions for their children,

12  and of children to have those decisions made by their parents rather than the state."

13  <u>Id.</u> at 1141 (citing <u>Parham v. J.R.</u>, 442 U.S. 584 (1979)).  Accordingly, the court held

14  that the Constitution assures parents,

15          in the absence of parental consent, [physical examinations] of their child
16          may not be undertaken for investigative purposes at the behest of state
            officials unless a judicial officer has determined, upon notice to the
17          parents, and an opportunity to be heard, that grounds for such an
            examination exist and that the administration of the procedure is
18          reasonable under all the circumstances.' [<u>van Emrik v. Chemung County</u>
19          <u>Dept. of Social Servs.</u>,] 911 F.2d 863, 867 (2d Cir. 1990).  Barring a
            reasonable concern that material physical evidence might dissipate
20          [citation omitted] or that some urgent medical problem exists requiring
            medical attention, the state is required to notify parents and to obtain
21          judicial approval before children are subjected to investigatory physical
22          examinations.

23  <u>Id.</u> at 1141.

24        The Ninth Circuit then held that the Constitution also guarantees parents the

25  right to be present at their child's exam, and guarantees children the right to have their

26  parents present, unless a valid reason exists for the parent's exclusion:

27          Moreover, parents have a right arising from the liberty interest in family
28          association to be with their children while they are receiving medical
            attention (or to be in a waiting room or other nearby area if there is a valid

1
2
3
4

> reason for excluding them while all or a part of the medical procedure is being conducted).  Likewise, children have a corresponding right to the love, comfort, and reassurance of their parents while they are undergoing medical procedures, including examinations—particularly those, such as here, that are invasive or upsetting.

Id. at 1142.

5
6
7
8
9

Nine years after Wallis, the Ninth Circuit again addressed the constitutionality of excluding parents from their child's medical exams.  In Greene v. Camreta, 588 F.3d 1011 (2009), defendants obtained a court order placing two children in protective custody.  The court also ordered a medical "assessment" of the children at the KIDS Center.  Id. at 1019.

10
11
12
13
14
15
16
17
18

On the day of the assessment, the mother went to the facility "intending to cooperate with the KIDS Center and lend whatever assistance and support she could to her daughter."  Greene, 588 F.3d at 1019 (internal brackets omitted).  However, at the direction of one of the defendants, the mother was forced to leave the premises. During the exam, the child was told to undress, her entire body was examined, pictures were taken of her "private parts," and a magnifying glass scope was used to visually examine her.  Id.  In the lawsuit that followed, the mother challenged, among other things, her exclusion from the premises during her daughter's assessment.  The district court granted defendant's summary-judgment motion, and plaintiff appealed.

19
20

In evaluating plaintiff's challenge, the Ninth Circuit stated that Wallis established two points:

21
22
23
24

> first, parents and children maintain clearly established familial rights to be with each other during potentially traumatic medical examinations; and second, this right may be limited in certain circumstances to presence nearby the examinations, if there is some "valid reason" to exclude family members from the exam room during a medical procedure.

25
26
27
28

Id. at 1036.  Relying on these principles, the court found that the "process" of "visual[ly] inspecti[ng] and photographing [] the children's genitals . . . could certainly be emotionally traumatic to a young girl. [Citation omitted.]"  Id. at 1037. Accordingly, the Ninth Circuit reversed the district court because, under those facts,

1  the "children's right to their mother's comfort and their mother's right to provide such

2  comfort were thus at their apex." Id.

3      With these principles in mind, the Court turns to the parties' claims.

4

5      **1.    County's policy of barring parents from their child's exam.**

6      There is no dispute that the County's policy excludes parents from their

7  children's medical exams at the Polinsky Children's Center.  The County defends this

8  policy on two grounds.  First, the County argues that because the Polinsky Children's

9  Center medical "assessments" are not "forensic investigatory examinations," Wallis and

10 Greene do not apply. (*Defs' MSJ*, p. 18.)  Second, the County argues that even if Wallis

11 and Greene apply, there are valid reasons for excluding parents.

12

13      **a.    *Wallis and Greene apply to the County's medical***

14      ***assessments.***

15      The County argues that the family's Fourteenth Amendment rights do not apply

16 to the medical examinations conducted at the Polinsky Children's Center because the

17 examinations are "nothing like the invasive investigatory exams of *Wallis*." (*Defs. MSJ*,

18 p. 18.)  According to the County, the children "are given a medical assessment" that

19 "includes a standard pediatric physical exam for the primary purpose of ensuring the

20 health and well-being of the children entering Polinsky, as well as to ensure no

21 contagious diseases are brought into the facility." (*Id.*)   Further, the County contends

22 that the exams "are brief, lasting 10-20 minutes, and the physician and staff maintain

23 a light, pleasant atmosphere" and "[m]ost children are not upset during the exam."

24 The Court disagrees for several reasons.

25      First, the County's attempt to distinguish its "medical assessment" from the

26 "forensic investigatory examinations" conducted in Wallis and Greene is unavailing.

27 To begin with, it is worth mentioning that the exams in Greene were also referred to

28 as "assessments," not "forensic investigatory" exams as the County contends. See Id.,

1   588 F.3d at 1019 ("the Juvenile Court . . . scheduled KIDS Center assessments for both

2   girls"), 1037 ("The KIDS Center assessments . . . "). More importantly, the description

3   of the assessment in <u>Greene</u> establishes that it was similar to the County's exams.

4        In <u>Greene</u>, "[d]uring the examination, [the child] was told to undress, and the

5   examiners 'looked all over [her] body,' 'took pictures of [her] private parts,' and used

6   a magnifying glass scope to visually examine her." <u>Id.</u> at 1019. Similarly, here, there

7   is no dispute the exams involved an examination of the children's external genitalia and

8   rectum (i.e., private parts), as well as 20 other "items" identified on the Polinsky

9   Children's Center Admission Physical Examination form, which necessarily required the

10  children to undress. (*Pls' Sealed Exhibits*, Ex. 19 at PCC 060; Ex. 29 at PCC 047; Ex.

11  34 at p.60.) Dr. Wright also confirmed that where sexual or physical abuse is

12  discovered, pictures are taken. (*Wright Dec.*, ¶ 7.) In light of these undisputed facts,

13  the only distinguishing feature between the County's exams and the exam in <u>Greene</u>

14  is the use of the magnifying scope. Nothing in <u>Wallis</u> or <u>Greene</u> suggests that the

15  Fourteenth Amendment liberty interest only applies when a magnifying scope is used.

16       Second, although the County contends that the "primary purpose" of its exams

17  is to ensure the well-being of the children, there is no dispute that the exams are still

18  investigatory because the physician is "looking for" contagious diseases ***and signs of***

19  ***physical or sexual abuse***. The investigatory nature is also borne out by the fact that the

20  exam involves the examination of "22 items," and by Dr. Wright's statements that

21  during the "visual evaluation of the genitalia," she is "looking for signs of physical or

22  sexual abuse" and that "[w]e take photos of any bruises or marks we see on the children

23  during the examinations." (*Wright Dec.*, ¶ 7.)

24       Third, even assuming the County's medical assessments are significantly different

25  from the exams in <u>Wallis</u> and <u>Greene</u>, neither case indicates that a family's

26  constitutional rights depend on how long the exam lasts or the degree of invasiveness.

27  To the contrary, <u>Wallis</u> held that "parents have a right arising from the liberty interest

28  in family association to be with their children *while they are receiving medical attention* .

1  . . ." Id., 202 F.3d at 1142 (emphasis added).  With regard to the children, Wallis held

2  they have "a corresponding right to the love, comfort, and reassurance of their parents

3  while they are undergoing *medical procedures* . . . ." Id. (emphasis added).  Because there

4  is no dispute that R.S. and D.S. were receiving me*dical att*ention or *undergoing a medical*

5  *procedure* while at the Polinsky Children's Center, under Wallis and Greene, Steven and

6  Joanna had a constitutional right to attend, and R.S. and D.S. had a constitutional right

7  to have their parents present.

8       Finally, the County's assertion that the exams do not implicate the Fourteenth

9  Amendment because children rarely get upset is also unavailing.  In Greene, the Ninth

10  Circuit explained that parents have "clearly established familial rights to be with each

11  other during *potentially* traumatic medical examinations."  Id., 588 F.3d at 1036

12  (emphasis added).  Use of the word "potentially" necessarily means that the right is not

13  contingent on the child becoming upset or traumatized.  Indeed, the child in Green

14  testified that "she felt fine after the examination was over and did not feel sick or

15  upset."  Id., at 1019.  Despite this testimony, the court held the child had a

16  constitutional right to have her mother present, and the mother a constitutional right

17  to be present.  Id. at 1037.

18       For all these reasons, the County's contention that its medical assessments need

19  not comply with the mandates of Wallis and Greene lack merit.[10]

20

21       **b.**    ***The County's reasons for excluding parents from the exams***

22            ***are not supported by the evidence or the law.***

23       Next, the County offers six justifications for excluding parents from their

24  children's examinations.  Three of the County's alleged justifications appear to be based

25  on a concern that the parents might interfere with the exam.  Specifically, the County

26  _____

27       [10] The County cites Mann v. County of San Diego, 2013 U.S. Dist. LEXIS 112094 (S.D.
    Cal., Aug. 8, 2013) in support of its argument that its policy is not unconstitutional.  For the

28  reasons discussed above, the Court disagrees with Mann.

1  contends that parents are excluded because: (1) the offending parent or parent

2  supportive of the offending parent can negatively effect the exam; (2) the staff creates

3  upbeat and light atmosphere; and (3) the potential for parents to manipulate exams.[11]

4  (*Defs.' Opp. Re. Cnty.*, p. 6.)

5        But the County has not cited any evidence suggesting that Steven or Joanna

6  would have interfered with the purportedly upbeat and light atmosphere, or that they

7  would have attempted to manipulate R.S.'s or D.S.'s exam.  Similarly, the County has

8  pointed to no evidence suggesting that at the time of the exams there was reasonable

9  grounds to believe either Steven or Joanna was an "offending parent" or "parent

10 supportive of an offending parent" that could have negatively effected the exam.  For

11 the reasons discussed above, the evidence was to the contrary.

12       Next, the County contends parents are validly excluded because the exam is

13 brief, lasting approximately 10–20 minutes.  (*Defs.' Opp. Re. Cnty.*, p. 6.)  But the

14 County fails to explain why this factor is sufficient to disregard the family's Fourteenth

15 Amendment liberty interest.  And while Dr. Wright confirms that the exams are brief,

16 she provides no basis for concluding that the presence of Steven or Joanna at the exam

17 would have impacted the length of the exam.  (*Dr. Wright Dec.* [Doc. 42-12], ¶ 9.)

18 Moreover, Dr. Wright's own declaration confirms that some of her exams last as long

19 (i.e., 20 minutes) as the full blown "forensic investigatory" exams.

20       Similarly, the County contends that parents are properly excluded because the

21 doctors are available for a limited time.  (*Defs.' Opp. Re. Cnty.*, p. 6.)  Again, the

22 County's opposition fails to explain why this justifies excluding parents from their

23 child's exam.  Dr. Wright's declaration states that having to schedule exams around the

24 parents' availability would negatively impact the ability of the staff to perform timely

25

26 _____

27      [11] The County also alleges that "practical difficulties" justify excluding the parents.
   However, the County has failed to identify such difficulties in either its Opposition or the
28 declarations of Wendy Wright, M.D., or Norma Rincon, which were cited in the Opposition
   as supporting evidence.  (*See Defs.' Opp. Re. Cnty.*, 6:13–25.)

1   exams, potentially leading to the loss of evidence of injuries. (*Dr. Wright Dec.*, ¶ 13.[12])

2   There are *at least* two problems with this justification.

3       First, in this case, the evidence of R.S.'s injuries was already documented. There

4   is no dispute that the injuries were documented during Dr. Siano's exam and Dr.

5   Dohrenwend's exam at the Kaiser's emergency room. Additionally, Bryson took

6   pictures of R.S.'s injuries and then examined the rest of her body. As for D.S., there is

7   no dispute that he was also examined by Dr. Dohrenwend, and that Bryson also

8   examined his body. In short, these undisputed facts establish that the County's concern

9   that evidence might be lost lacks merit.

10       Second, if a parent genuinely appears to be attempting to delay the exam so that

11   evidence will dissipate, under <u>Wallis</u> and <u>Greene</u>, the County would then be justified

12   in proceeding with the exam. But this necessarily requires the County to attempt to

13   notify the parents about the exam and allow them a reasonable opportunity to attend.

14   Regardless, here the undisputed facts establish that the children's exams were not

15   required to preserve evidence and there is no evidence to support an inference that

16   Steven or Joanna would have attempted to delay or interfere with the exams.

17       Finally, the County contends that Steven and Joanna were properly excluded

18   from the exam because the clinic is located in a confidential area of the Polinsky

19   Children's Center. (*Defs.' Opp. Re. Cnty.*, p. 6.) According to the County's witnesses,

20   parents are properly excluded from the confidential area to protect other children's

21   identities and their medical and juvenile records, which are kept in the clinic. (*See Dr.*

22   *Wright Dec.*, ¶ 14; *Rincon Dec.*, (sealed) [Doc. 42-8], ¶ 3.) The explanation lacks merit.

23       Given the fundamental rights at stake, this Court reads the County's ability to

24   exclude parents from their child's exam as an exception to the general rule that parents

25   must be allowed to attend. This finding is supported by the Ninth Circuit's explanation

---

27      [12] The Court has granted Defendants' request to file Dr. Wright's declaration under seal

28   because it contains confidential information related to R.S. and D.S.'s medical exams. However, certain non-confidential statements in the declaration have been referenced in this order.

that the right to be present "may be limited *in certain circumstances* to presence nearby the examination, if there is some 'valid reason' to exclude family members from the exam room during the procedure." Greene, 588 F.3d at 1036 (emphasis added). So, for example, a valid reason will exist if there is reasonable cause to believe the parent is abusive or, perhaps, where the non-abusive parent is so emotionally distraught that they would disrupt the exam.

However, under the County's policy, the exception has become the general rule. It admits that all parents are excluded from their child's exam because of where the County has chosen to conduct its medical exams. Even more troubling, the evidence clearly establishes that—at the time of R.S. and D.S.'s medical exams—the County had known for approximately seven years, since its involvement in Parkes, that the location where it conducted the medical exams violated the family's constitutional rights, yet the County did nothing to relocate the exam room. For these reasons, the Court finds the County's justification insufficient, and that its policy was the moving force in violating the family's constitutional rights.

## 2. Lack of parental notice and consent.

Plaintiffs contend the County's medical examination of R.S. and D.S. violated the family's constitutional rights because there was no parental consent, the exams were performed without a valid court order, and there was no exigency. (*Pls.' MSJ Re. Cnty.* [Doc. 46-1], p. 3.) The County contends (1) the exams are lawful because they are authorized by law, and (2) Joanna consented to the exams.

### a. *The County's exams are not authorized by law.*

The County contends that its exams are lawful because they were authorized by a 2007 Juvenile Court Order (the "2007 Order") and complied with California Welfare & Institutions Code § 324.5. These arguments lack merit.

The 2007 Order authorizes "a comprehensive health assessment as recommended by the AAP . . . for a child prior to the detention hearing in order to ensure the health, safety, and well-being of the child." (*Pls' RJN* [Doc. 46-3], Ex. 1 [Doc. 46-4] at p. 1.) Under it terms, "the assessment may include one or more of the following, as is ***necessary and appropriate to meet the child's needs***: . . . b. A physical examination by a licensed medical practitioner." (*Id.*, emphasis added.) The 2007 Order further provides that it "shall expire four years after the date of issuance unless superseded or rescinded by subsequent order or rule of court." (*Id.* at p.2.) The County's reliance on this order is misplaced for several reasons.

First, under <u>Wallis</u>, parental consent is unnecessary where "a judicial officer has determined, upon notice to the parents, and an opportunity to be heard, that grounds for such an examination exist and that the administration of the procedure is reasonable under all the circumstances." <u>Id.</u>, 202 F.3d at 1141. Here, the Order was issued in January 2007. Because there is no dispute that R.S. and D.S. were removed and examined in 2011, it is undisputed that Steven and Joanna did not receive notice and did not have an opportunity to be heard. Accordingly, the 2007 Order is insufficient under <u>Wallis</u> to authorize the medical exams of R.S. and D.S. without parental consent.

Second, the 2007 Order authorizes exams that are "necessary and appropriate to meet the child's needs . . . ." (*Pls' RJN*, Ex. 1 at p. 1.) Here, Dr. Wright's testimony does not explain why the examinations were necessary and appropriate to meet the needs of R.S. and D.S. The lack of such evidence is compounded by the undisputed fact that less than 24 hours before the County conducted the exams, R.S. and D.S. were examined by Dr. Dohrenwend, and R.S. had also been examined by Dr. Siano. In light of those exams, it is entirely unclear why the County believed another exam of the children was "necessary and appropriate."

Third, by its terms, the 2007 Order expired "four years after the date of issuance . . . ." (*Pls' RJN*, Ex. 1 at p. 2.) Because the order was issued on January 8, 2007, it

1  expired on January 8, 2011, and thus did not apply to R.S. and D.S.'s exams.  And the

2  County has neither argued nor provided evidence indicating that the 2007 Order was

3  ever extended.  For this additional reason, the County's reliance on the order as

4  authorization for the exams lacks merit.

5      Next, the County asserts that the exams were lawful under California Welfare

6  & Institutions Code § 324.5. This statute requires a local law enforcement agency or

7  local child welfare department that takes a child suspected of physical or sexual abuse

8  into protective custody to "consult with a medical practitioner" specializing in child

9  abuse to "determine whether a physical examination of the child is appropriate." Cal.

10  Welf. & Inst. Code § 324.5(a).  "If deemed appropriate," the agency or department

11  "shall cause the child to undergo a physical examination" by a medical practitioner

12  specializing in child abuse "and, *whenever possible*, shall ensure that this examination

13  take place within 72 hours of the time the child was taken into protective custody." Id.

14  (emphasis added).

15      Nothing in section 324.5(a) authorized the County to perform the examinations

16  on R.S. and D.S. without parental notice and consent or in the absence of judicial

17  authorization.  Indeed, as Plaintiffs point out, the County raised this exact argument in

18  Wallis, and the Ninth Circuit recognized that there is "no apparent conflict between

19  the requirements of this opinion and the statute in question." Id., 202 F.3d at 1141, f.n.

20  12.[13] This Court also fails to see any conflict between Wallis's requirements and section

21  324.5.  Accordingly, the Court finds the statute did not authorize the medical

22  examinations of D.S. and R.S. without parental notice or consent.

23  //

24  //

25

26

27

28

---

[13]   However, because the medical exams at issue in Wallis occurred seven years before the statute was enacted, the Ninth Circuit did not decide "whether or to what extent the law is affected by our decision here." Id., 202 F.3d at 1141 n.12.

1
2

             **b.**      **_The County's consent forms do not cover the medical assessments._**

3
4
5
6
7
8
9

    "It is well established that a search conducted pursuant to a valid consent is constitutionally permissible." <u>Dubbs v. Head Start, Inc.</u>, 336 F.3d 1194, 1199, 1207 (10th Cir. 2003) (citations omitted).  Additionally, "because the Fourth Amendment prohibits only 'unreasonable' searches and seizures, the Supreme Court has held that the Amendment is satisfied when, under the circumstances, it is objectively reasonable for the official to believe that the scope of a person's consent permitted him to conduct the search." <u>Id.</u> (citations omitted).

10
11
12

    Here, the County argues that Joanna consented to R.S. and D.S.'s medical exams when she signed the form entitled "Consent for Treatment - Parent." (*Defs.' MSJ*, p. 20.)  There are three problems with the County's reliance on this form.

13
14
15
16
17
18
19
20
21

    First, the undisputed evidence establishes that the consent forms did not cover the children's drug testing or R.S.'s skeletal exam.  There is no dispute that Joanna did not sign the forms until well after the County began urine testing the children.  Joanna signed the consent forms sometime "after lunch," when Rollins traveled to the Swartwood home to interview them.  (*Rollins Dec.*, ¶ 10; *Defs' NOL*, Ex. D (sealed) [Doc. 44], Ex. E (sealed) [Doc. 44].)  However, the undisputed evidence establishes that the urine testing began at approximately 2:00 a.m. earlier that morning.  (*Id.*)  Thus, when the testing was performed, Joanna had not "consented" to the medical treatment.

22
23
24
25
26
27
28

    Similarly, there is no dispute that when Rollins gave Joanna the forms to sign, Rollins raised the issue of conducting a skeletal exam on R.S.  (*Rollins Dec.*, ¶ 9.) Rollins admits that Steven and Joanna both refused to consent to the skeletal exam. (*Id.*)  There is also no dispute that before the exam was performed, "someone" told Rollins that R.S. was being taken to Kaiser for the skeletal exam, and Rollins specifically notified them that the parents did not consent to the exam.  (*Id.*, ¶ 15.)

12-CV-1665 W

1   Based on these undisputed facts, it was not "objectively reasonable" for the County to
2   believe that the scope of Joanna's consent covered the skeletal exam.

3       The second problem with the consent forms is that they only permitted Dr.
4   Wright to conduct the medical exams "if . . . for any reason[,]" Dr. Ireland could not
5   perform the exam.  The County's consent form gives the parent the option of indicating
6   a preference for their child to receive "treatment" from a designated "private physician."
7   (*Def.s NOL*, Ex. D (sealed) [Doc. 44], Ex. E. (sealed) [Doc. 44].)  The form states that
8   "[i]f private treatment is selected and cannot, for any reason, be performed, I hereby
9   authorize treatment at a licensed hospital/medical facility."  (*Id.*)

10      Here, in signing the form, Joanna selected the "private physician" option and
11  consented to the children's regular pediatrician, Dr. Ireland, as the doctor authorized
12  to provide treatment.  (*Def.s NOL*, Ex. D (sealed), Ex. E. (sealed).)  Thus, based on the
13  terms of the consent form, Joanna consented to a County physician providing
14  "treatment" to R.S. and D.S. "if" there was some reason Dr. Ireland could not do so.
15  Defendants have failed to argue, much less provide any evidence indicating that Dr.
16  Ireland could not perform R.S.'s and D.S.'s medical assessments.  Accordingly, the
17  County has failed to establish that the consent forms allowed Dr. Wright to perform
18  R.S.'s and D.S.'s medical assessments.

19      Third, Plaintiffs challenge the validity of the consent forms.  Specifically,
20  Plaintiffs contend Joanna signed the forms without informed consent because the forms
21  misleadingly characterize the physical examinations as conditional.  (*Pls.' Reply Re.*
22  *Cnty.* [Doc. 64], p. 4.)  The Court agrees.

23      By signing the "Consent for Treatment - Parent" form, Joanna consented to
24  "medical, developmental, dental, and mental health care to be given" to R.S. and D.S.
25  "while . . . in any facility operated by the Health and Human Services Agency . . . *if the*
26  *treatment is recommended by a licensed physician, dentist, psychiatrist or other mental health*
27  *practitioner.*" (*Def.s NOL*, Ex. D (sealed), Ex. E. (sealed) (emphasis added).)  The form
28  also lists a variety of procedures comprising "[m]edical, developmental, dental, or

mental health care," which includes the sole reference to "routine admission and placement examination." (*Id.*) Then, as discussed above, the form allows the parent to select a "private physician" to perform the treatment. (*Id.*)

The form is misleading because it strongly suggests at the time the document is signed that there are no plans to provide "treatment" to the child. Instead, by indicating that such treatment will be provided "if . . . recommended by a licensed" doctor, the form leaves the parent with the impression that there has been no determination made as to whether the child will receive any treatment. In reality, pursuant to the County's policy, when the form is signed, the child *shall* undergo a "routine admission and placement examination."

Moreover, the very title of the form, "Consent for Treatment–Parent" and repeated use of the term "treatment" in the document is also misleading. According to the American Heritage Medical Dictionary, the term "treatment" refers to "[a]dministration or application of remedies to a patient or for a disease or an injury; medicinal or surgical management; therapy." (The American Heritage Medical Dictionary 551 (2008).) Similarly, Mosby's Medical Dictionary defines the term as "the care and management of a patient to combat, ameliorate, or prevent a disease, disorder, or injury." (Mosby, Inc., Mosby's Medical Dictionary (8th ed. 2009), available at http://medical-dictionary.thefreedictionary.com/treatment.) Consistent with these definitions, the form specifically states that "treatment" will be provided "if . . . recommended . . . ." Thus, the County's repeated use of the term "treatment" leaves the parent with the distinct impression that by signing the form, the parent is consenting to the child receiving medical care if a condition—such as a fever, cold, etc.—arises while the child is in the Polinsky Children's Center. The form does not provide any notice that in executing the form, the parent is consenting to the County's mandatory 22-point health assessment that includes an examination of the child's external genitalia and rectum.

1        In a case involving forms soliciting parental permission for tests "if needed," the

2  Tenth Circuit criticized the form for failing to obtain adequate consent. <u>Dubbs</u>, 336

3  F.3d at 1199, 1207. Resting on the common law adage of construing "ambiguous

4  language against the interest of the party that drafted it," the court found that a typical

5  reasonable parent would not have understood the forms to constitute consent to the

6  administration of "general physical exams." <u>Id.</u> at 1208, 1209 (citing <u>Mastrobuono v.</u>

7  <u>Shearson Lehman Hutton, Inc.</u>, 514 U.S. 52, 62–63 (1994)).

8        Similar to the forms in <u>Dubbs</u>, the County's consent forms create an "exercise in

9  obfuscation and misdirection." 336 F.3d at 1211. As in <u>Dubbs</u>, the County's forms

10  require parents to parse the language, which seems to authorize treatment if

11  recommended rather than the mandatory 22-point medical exam performed by the

12  County. Reading the ambiguity in the forms against the drafting party—the County—

13  the Court finds that the forms failed to notify Joanna that R.S. and D.S. would be

14  subjected to the mandatory medical assessments.

15

16     **E.**    **Plaintiffs' state-law claims.**

17        Defendants seek partial summary judgment as to Plaintiffs' state-law claims for

18  assault, battery, false imprisonment, and state civil rights violations on two grounds.

19  First, Defendants contend the Individual Defendants are immune from liability for

20  Plaintiffs' injuries under California law. (*Defs. MSJ*, pp. 21–22.) Second, Defendants

21  contend the undisputed facts establish that the Individual Defendants are not liable.

22  (*Id.*, pp. 22–23.) Because the Court finds that the Individual Defendants are protected

23  by state immunity, partial summary judgment as to the state-law claims is appropriate.

24

25     **1.**    **State immunity.**

26        California law insulates government workers from injuries resulting from their

27  actions by granting them "discretionary immunity," "whether or not such discretion be

28  abused." Cal. Gov't Code § 820.2. Additionally, California law affords protection to

public employees who cause injuries by "instituting or prosecuting any judicial or administrative proceeding within the scope of [their] employment, even if [they] act maliciously and without probable cause." Id. § 821.6.

Defendants contend that state immunity provides broad protection for their actions, even where the social workers' actions were improper under federal law.  In fact, "[t]he immunity even applies to 'lousy' decisions in which the worker abuses his or her discretion, including decisions based on 'woefully inadequate information.'" Christina C. v. Cnty. of Orange, 220 Cal. App. 4th 1371, 1381 (2013) (citing Ortega v. Sacramento Cnty. Dept. of Health & Human Serv.s, 161 Cal. App. 4th 713, 733 (2008)).  As Defendants point out, discretionary immunity applies even to "grossly incorrect" conclusions and "improper evaluation[s]" by social workers. Id. (citing 161 Cal. App. 4th at 733 (2008)).

Plaintiffs respond that Defendants are not entitled to immunity because California Civil Code § 820.21 withdraws civil immunity from juvenile court social workers and child protection workers if they maliciously commit perjury, fabricate evidence, fail to disclose known exculpatory evidence, or obtain testimony by duress, fraud, or undue influence.  Thus, in order to establish that discretionary immunity does not apply, Plaintiffs must point to specific evidence establishing the circumstances fall within section 820.21.

### a.    _Defendants Curiel and Bryson._

Plaintiffs contend that Bryson and Curiel "attempted to obtain testimony by duress, fraud and undue influence." (_Pl.s' Opp._ [Doc. 54], p. 22.)  Focusing solely on Bryson, they claim she "used duress and undue influence" during her initial interrogation of the parents at their home, including forcing them to "strip their children for her inspection," and afterward, by forcibly removing the children "with the express intent to have them examined and tested . . . in an attempt to obtain further evidence against the family." (_Id._)  Plaintiffs argument is insufficient for two reasons.

First, Plaintiffs' argument is based largely on conlcusory allegations that are not supported by citations to evidence. For example, Plaintiffs claim Bryson came to their home under false pretenses to examine and remove the children. But the undisputed evidence establishes that Dr. Siano and Nurse Fowler contacted the Agency and made mandatory reports of R.S.'s injuries. The evidence further establishes that Curiel sent Bryson to the Swartwood home to investigate and determine whether the children were safe. Joanna also admits in her declaration that when Bryson arrived at her house, Joanna "invited" her in. Additionally, while Joanna contends that Bryson "demanded" that Joanna disrobe the children so Bryson could examine them, neither Steven nor Joanna's declaration provide any specific factual details suggesting that Bryson was "taking an unfair advantage" of Plaintiffs.

Second, aside from failing to cite evidence pointing to duress or undue influence, Plaintiffs wrongly interpret "testimony" to encompassing Bryson's questioning Steven and Joanna, examining the children in their home, or removing the children from their parents' custody. However, "testimony" applies to conduct closely related to the judicial process, and not home interviews such as Bryson's or information obtained from an examination that is included in a draft detention report. See Olvera v. Cnty. of Sacramento, 932 F. Supp. 2d 1123, 1179 (E.D. Cal. 2013). Thus, even if the facts suggested Bryson or Curiel took advantage of the Plaintiffs, they fail to provide evidence that the information obtained was "testimony." For these reasons, Bryson and Curiel are immune from liability for Plaintiffs' state-law claims.

### b. *Defendants Rollins and Solis.*

Plaintiffs argue Rollins and Solis, holding positions of authority, signed a detention report falsely alleging abuse by the parents and "failed to provide exculpatory information." (*Pls. Opp.*, p. 22.) But Plaintiffs fail to specify the exculpatory facts that were not disclosed.

More importantly, the undisputed facts establish that in conferring with County Counsel, Rollins disclosed that the only hesitation in returning the children to their parents' custody was the timing of the injury causing event.  The evidence further establishes that once the County's pediatricians confirmed the event likely occurred around the time that the injuries manifested, Rollins and Solis decided to return the children.  Based on these undisputed facts, and Plaintiffs failure to point to any evidence supporting the claim that section 820.21 applies, the Court also finds Defendants Rollins and Solis are immune from liability for Plaintiffs' state-law claims.

## IV.   CONCLUSION & ORDER.

For the reasons stated above, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion for partial summary judgment [Doc. 42], **GRANTS IN PART** and **DENIES IN PART** Plaintiffs' motion for partial summary judgment against the Individual Defendants [Doc. 45], and **GRANTS** Plaintiffs' motion for partial summary judgment against the County [Doc. 46]as follows:

1. The Court finds defendants Rollins and Curiel are entitled to qualified immunity with respect to Plaintiffs' federal claims, and defendants Bryson, Curiel, Rollins and Solis are entitled to immunity with respect to Plaintiff's state-law claims.  Defendants' motion is denied in all other respects.

2. The Court finds Plaintiffs are entitled to partial summary judgment against Bryson and Curriel on the federal claims arising out of R.S. and D.S.'s removal from the parents' custody.  Plaintiffs' motion is denied in all other respects.

3. Plaintiffs are also entitled to partial summary judgment against the County on the federal claims with respect to the medical exams of R.S. and D.S.

**IT IS SO ORDERED.**

DATE: September 30, 2014

_____

Hon. Thomas J. Whelan
United States District Judge